THE HONORABLE THOMAS S. ZILLY

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| REX – REAL ESTATE EXCHANGE, INC., | Case No. 2:21-cv-00312-TSZ |
| Plaintiff, | **THE NATIONAL ASSOCIATION OF** |
| v. | **REALTORS'® MOTION TO DISMISS** |
| ZILLOW, INC., et al. | **THE COMPLAINT** |
| Defendants. | NOTE ON MOTION CALENDAR: |
| | July 23, 2021 |
| | ORAL ARGUMENT REQUESTED |

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION.................................................................................................... 1

II.  BACKGROUND..................................................................................................... 2

    A.  REX Has Challenged an Optional NAR Model Rule That Has Not Been Adopted by All NAR-Affiliated Multiple Listing Services ..................................... 2

    B.  Zillow Changed Its Website in Early 2021 to Display Listings on Two Tabs.......... 4

    C.  REX's Listings Are Still Published on Zillow's Website ....................................... 4

III.  ARGUMENT ........................................................................................................ 5

    A.  REX Does Not Have Article III Standing to Pursue Its Claims Against NAR......... 5

    B.  REX Has Not Asserted a Valid Antitrust Claim Under Federal or State Law.......... 7

        1.  There Is No Agreement Concerning the Commingling of Listings.............. 7

        2.  REX Fails to Allege Antitrust Injury ........................................................ 9

        3.  REX Has Not Pleaded a Plausible Group Boycott Claim ......................... 11

        4.  REX Has Not Pleaded a Plausible Claim Under the Rule of Reason ......... 12

    C.  REX Has Not Asserted Valid False Advertising Claims Against NAR ................. 14

    D.  REX Cannot Cure Its Pleading Deficiencies Through Amendment ...................... 15

CONCLUSION ................................................................................................................ 15

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    i

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*AFMS LLC v. United Parcel Serv. Co.*,
  105 F. Supp. 3d 1061 (C.D. Cal. 2015) .............................................................. 13

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) ........................................................................... 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 2

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .......................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................... 7, 9

*Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*,
  878 F. Supp. 1389 (W.D. Wash. 1993) ............................................................ 14

*Hahn v. Or. Physicians' Serv.*,
  868 F.2d 1022 (9th Cir. 1988) ..................................................................... 11, 12

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ........................................................................... 8

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ............................................................................. 2

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ........................................................................... 8

*Khalid v. Microsoft Corp.*,
  2020 WL 1674123 (W.D. Wash. Apr. 6, 2020) ............................................... 14

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ........................................................................... 2

*Lenhoff Enterprises, Inc. v. United Talent Agency, Inc.*,
  729 F. App'x 528 (9th Cir. 2018) ...................................................................... 8

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989) ........................................................................... 10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................... 5

*MGIC Indem. Corp. v. Weisman*,
  803 F.2d 500 (9th Cir. 1986) ............................................................................. 3

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) .......................................................................................... 7

*Multicare Health Sys. v. Lexington Ins. Co.*,
  539 F. App'x 768 (9th Cir. 2013) ...................................................................... 2

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) ........................................................................... 7

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ........................................................................................ 11

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ

ii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

*Ohio v. Am. Express Co.,*
   138 S. Ct. 2274 (2018) ............................................................................................ 9, 12

*Pennsylvania Ave. Funds v. Borey,*
   569 F. Supp. 2d 1126 (W.D. Wash. 2008) ................................................................ 14

*Pool Water Prods. v. Olin Corp.,*
   258 F.3d 1024 (9th Cir. 2001) ............................................................................... 9, 11

*Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.,*
   2009 WL 10727790 (W.D. Wash. Nov. 16, 2009) .................................................. 14

*Rebel Oil Co. v. Atl. Richfield Co.,*
   51 F.3d 1421 (9th Cir. 1995) ............................................................................... 12, 13

*Reddy v. Litton Indus., Inc.,*
   912 F.2d 291 (9th Cir. 1990) ................................................................................... 15

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.,*
   2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ......................................................... 13

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,*
   806 F.2d 1393 (9th Cir. 1986) ................................................................................. 15

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,*
   554 U.S. 269 (2008) .................................................................................................. 5

*State v. LG Elecs., Inc.,*
   375 P.3d 1035 (2016) ................................................................................................ 8

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union,*
   2017 WL 5973279 (C.D. Cal. Mar. 7, 2017) .......................................................... 11

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.,*
   368 F.3d 1053 (9th Cir. 2004) ................................................................................. 15

*United States v. Nat'l Ass'n of Real Estate Bds.,*
   339 U.S. 485 (1950) .................................................................................................. 8

*Wilcox v. First Interstate Bank of Oregon,*
   815 F.2d 522 (9th Cir. 1987) .................................................................................... 8

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.,*
   588 F.3d 659 (9th Cir. 2009) .................................................................................... 7

## **Statutes**

15 U.S.C. § 1 ................................................................................................................... 7

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ       iii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

Defendant National Association of REALTORS® moves under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiff REX – Real Estate Exchange, Inc.'s Complaint (ECF 1) because REX lacks standing to assert its claims against NAR and the Complaint fails to state a claim against NAR upon which relief can be granted.

## I.    INTRODUCTION

NAR does not belong in this case at all.  Because NAR's only alleged involvement in the events alleged in the Complaint is that it passed an optional model rule over a decade ago, REX does not have Article III standing to pursue claims against NAR, REX has not alleged a "contract, combination, or conspiracy" or harm to competition (which are both required to plead a valid conspiracy claim under the antitrust laws), and REX has not alleged NAR engaged in any advertising, let alone false advertising.

As REX alleged in its Complaint, NAR Model Rule 18.3.11 provides that local multiple listing services affiliated with NAR may—but are not obligated to—require that "[l]istings obtained through [internet data exchange] feeds from Realtor® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources." Compl. ¶ 85.  Because this Rule "appears in NAR's IDX optional model rules," *id.*, local multiple listing services are free to decide whether their members' websites can commingle MLS listings with listings from other sources.  And REX alleges that "[m]any, ***but not all*** multiple listing service organizations, have adopted NAR's 'optional' IDX rule." *Id.* ¶ 158 (emphasis added); *see also id.* ¶ 161 (alleging that Section 18.3.11 was "adopted by ***some*** MLSs" (emphasis added)).  Therefore, "Zillow's decision," *id.* ¶ 160, to separately display MLS listings and listings obtained from other sources (without regard for whether the local multiple listing services it has joined allow listings to be commingled) was the product of Zillow's independent actions and does not give rise to any valid claims against NAR.

NAR respectfully asks the Court to dismiss with prejudice all claims REX has asserted against NAR.  Allowing REX to amend its claims against NAR would be futile, particularly since REX cannot amend around the myriad pleading deficiencies consistent with its obligations under Rule 11.

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

## II.     BACKGROUND

**A.     REX Has Challenged an Optional NAR Model Rule That Has Not Been Adopted by All NAR-Affiliated Multiple Listing Services**

NAR is a non-profit trade association made up real estate professionals.  Compl. ¶ 11.[1]  Its membership includes 1.45 million individuals, 54 state and territory associations, and approximately 1,130 local associations.  *Id.* ¶ 24.  Those NAR-affiliated associations operate multiple listing services in local markets across the country.  *Id.* ¶ 25.

A multiple listing service is a cooperative of real estate professionals that facilitates real estate transactions in a particular geographic region.  As explained in the GAO report cited in REX's Complaint (Compl. ¶ 34 n.5):

> Most local real estate markets have an MLS that pools information about homes that area brokers have agreed to sell.  Participating brokers use an MLS to "list" the homes they have for sale, providing other brokers with detailed information on the properties, including how much of the commission will be shared with the buyer's agent.  An MLS serves as a single, convenient source of information that provides maximum exposure for sellers and facilitates the home search for buyers.

U.S. Gov't Accountability Office, GAO-05-947, *REAL ESTATE BROKERAGE: Factors That May Affect Price Competition*, at 6 (2005), *available at* https://www.gao.gov/assets/gao-05-947.pdf (Ex. A to NAR's Request for Judicial Notice).[2]  Multiple listing services provide internet data exchange (IDX) feeds to their members, which enable members of a multiple listing service to publish listings on their own websites that were submitted to the multiple listing service by other members.  Compl. ¶¶ 83-84.

NAR promulgates model rules and policies for its local associations relating to the operation

---

[1]     For the purposes of this Motion only, all factual allegations are assumed to be true.  *See Multicare Health Sys. v. Lexington Ins. Co.*, 539 F. App'x 768, 769 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[2]     The Court may consider the GAO report when ruling on NAR's motion to dismiss under the "incorporation by reference doctrine" which "permits [courts] to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (second alteration in original) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

of multiple listing services, including IDX feeds. Compl. ¶¶ 85-86 & n.11. Its Handbook on

Multiple Listing Policy includes mandatory, optional, and informational rules and policies. *See*

NAR, Handbook on Multiple Listing Policy, at i (33d ed. 2021), *available at* https://cdn.nar.realtor/

sites/default/files/documents/2021_NAR_HMLP_210112.pdf (Ex. B to NAR's RJN).[3] In this case,

REX is challenging one of "NAR's IDX *optional* model rules." Compl. ¶ 85 (emphasis added).

Specifically, Section 18.3.11, provides that multiple listing services may, but are not required to,

require that:

> Listings obtained through IDX feeds from REALTOR® Association MLSs where the
> MLS participant holds participatory rights must be displayed separately from listings
> obtained from other sources. Listings obtained from other sources (e.g., from other
> MLSs, from non-participating brokers, etc.) must display the source from which each
> such listing was obtained.

*Id.* "Many, but not all multiple listing service organizations, have adopted [this] 'optional' IDX

rule." *Id.* ¶ 158; *see also id.* ¶ 161 (alleging that Section 18.3.11 was "adopted by some MLSs").

NAR has maintained a materially similar rule since at least 2008. In 2005, the Antitrust

Division of the United States Department of Justice filed an antitrust complaint in the Northern

District of Illinois challenging certain mandatory NAR rules regarding the display of multiple listing

service data using the Internet.[4] *See* Compl., *United States v. Nat'l Ass'n of REALTORS®*, Case

No. 1:05-cv-5140, Dkt. 1 (Sept. 8, 2005 N.D. Ill.) (Ex. C to NAR's RJN). NAR and the Department

of Justice settled that case three years later. *See* Final Judgment, *United States v. Nat'l Ass'n of*

*REALTORS®*, Case No. 1:05-cv-5140, Dkt. 248 (Nov. 18, 2008 N.D. Ill.) (Ex. D to NAR's RJN).

The settlement terms were memorialized in a consent decree, which was entered by the District

Court on November 18, 2008. The consent decree required NAR to adopt a "Modified VOW

Policy," which was attached to the decree. *See id.* §§ II.I, V.C. The Modified VOW Policy NAR

---

[3] REX's allegations quote from NAR's Handbook on Multiple Listing Policy. *See* Compl. ¶ 85
& n.11. The Handbook is therefore incorporated by reference into the pleading. *Supra* n.2.

[4] "On a motion to dismiss, [a court] may take judicial notice of matters of public record outside
the pleadings," including publicly available filings in other lawsuits. *MGIC Indem. Corp. v.
Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (noticing a "motion to dismiss together with a
supporting memorandum" filed in a separate case).

was required to adopt under its settlement with the Department of Justice contained the following provision:

> An MLS may not prohibit Participants from downloading and displaying or framing listings obtained from other sources, e.g., other MLSs or from brokers not participating in that MLS, etc., **but may require either that (i) such information be searched separately from listings obtained from other sources, including other MLSs** . . . .

*Id.*, Ex. A, § IV.3 (emphasis added).

**B.    Zillow Changed Its Website in Early 2021 to Display Listings on Two Tabs**

In the fall of 2020, Zillow announced that it was joining some multiple listing services so that it could "use MLS data feeds to populate its website."  Compl. ¶¶ 59-60.  Prior to joining local multiple listing services, Zillow's website returned search results as a single tab.  *Id.* ¶ 62.  Now, search results are divided between two tabs—one for "Agent Listings," and another for "Other Listings"—that are simultaneously displayed to the user after a search.  *Id.* ¶ 64.  "To see every home listed for sale, [users] must move back and forth between these tabs."  *Id.* ¶ 66.  Zillow implemented the change to its website uniformly, nationwide.  *Id.* ¶ 99.

**C.    REX's Listings Are Still Published on Zillow's Website**

REX is a real estate brokerage.  Compl. ¶ 40.  REX does not belong to NAR or any local multiple listing services.  *Id.* ¶ 127.  "REX uses digital technology to market the home directly to consumers looking to buy, sell, and manage their home."  *Id.* ¶ 41.  Specifically, "[t]hrough REX's proprietary technology, consumers can list their homes from their smartphones and see their listing go live within two days with ads specifically targeting interested buyers," and "REX's ad generation algorithms generate personalized ads targeting online home shoppers."  *Id.*  Additionally, both before and after Zillow joined local multiple listing services, REX advertises listings on Zillow's websites.  *Id.* ¶¶ 56, 74.  Following Zillow's website change, some of REX's listings appear on the "Other Listings" tab, *id.* ¶ 67, and others appear on the "Agent Listings" tab, *id.* ¶ 65 (alleging that the "'Agent listings,' [tab] displays homes listed by MLS agents"); *id.* ¶ 111 (alleging that REX can "co-list properties with MLS members to increase [their] online profile").

NAR's Motion to Dismiss
Case No. 2:21-cv-00312-TSZ                    4

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

### III.    ARGUMENT

**A.    REX Does Not Have Article III Standing to Pursue Its Claims Against NAR**

In order to have Article III standing, a plaintiff "must adequately establish" injury in fact, causation, and redressability. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). REX alleges that it "has suffered significant declines in its listing views and showings because of the change in display implemented by Zillow, which has in turn injured REX." Compl. ¶ 100. For the purpose of this motion to dismiss, NAR assumes that this is a sufficiently alleged injury-in-fact. Even under a generous reading of the facts alleged in the Complaint, however, REX has failed to plead its alleged injury was caused by NAR's actions or that it is redressable through a suit against NAR.

***First***, NAR has not caused REX's alleged injuries. NAR's only connection to "Zillow's website redesign" is that Zillow belongs to NAR and affiliated local multiple listing services and it has agreed to "adhere[] to their rules." Compl. ¶ 87; *see also id.* ¶ 107 (alleging that "NAR and its licensee members, MLSs and their licensee members, and Zillow, which has memberships in both, have . . . agreed to abide by their rules, including the IDX segregation rule"). Any connection between REX's alleged injuries and NAR's action is broken by two simple facts, both of which are alleged by REX: (1) NAR's model multiple listing service rules only apply to multiple listing services, and Zillow is not a multiple listing service, Compl. ¶ 59 (alleging that Zillow is an "MLS participant"); *id.* ¶ 83 ("The NAR issues guidelines for the MLSs to follow . . . ."); *id.* ¶ 156 (alleging that the "model rules [are] promulgated by NAR and adopted by many MLSs"); and (2) the particular model rule that REX has challenged is optional for multiple listing services, which means they are not required to follow it, *id.* ¶ 85. Thus, Zillow is not obligated to follow Section 18.3.11 of NAR's IDX Policy based solely on its status as a member of NAR, and whether any particular multiple listing service has decided to adopt a rule like Section 18.3.11 is an independent action by a third party that is not before the Court. *See Lujan*, 504 U.S. at 560-61 (requiring plaintiffs to show that their injuries are "not the result of the independent action of some third party" to establish causation) (cleaned up)).

REX cannot avoid these breaks in the chain of causation by claiming that Zillow

1  "implemented this change nationwide on its websites Zillow.com and Trulia.com," without regard

2  for the requirements adopted by the local multiple listing services it joined. *See* Compl. ¶ 70. REX's

3  allegations show that those Zillow actions were independent of any action taken by NAR. REX

4  alleges that "[m]any, ***but not all*** multiple listing service organizations, have adopted NAR's

5  'optional' IDX rule, which prohibits the co-mingling in residential real estate search results of

6  listings from MLS-affiliated agents and other listings." *Id.* ¶ 158 (emphasis added); *see also id.*

7  ¶ 161 (alleging that Section 18.3.11 was "adopted by some MLSs"). Thus, according to REX's own

8  allegations, Zillow had no obligation to implement a change to its listings display to comply with

9  the rules of every local multiple listing service it joined, but it did so anyway, independently and for

10 its own reasons.[5]

11     Additionally, according to REX's own allegations, Zillow's decision to label the two tabs

12 on its website "Agent Listings" and "Other Listings," and to place some of REX's listings under the

13 "Other Listings" tab, were actions that were independent of NAR. NAR was not involved in those

14 decisions. The Complaint refers to "Zillow's recently implemented website changes," Compl. ¶ 8;

15 "Zillow's change in web display," *id.* ¶ 22; the fact that "Zillow now categorizes MLS listings as

16 'Agent Listings' and all non-MLS listings as 'Other Listings,'" *id.* ¶ 98; the "Zillow-implemented

17 categorization and display," *id.*; and the fact that "Zillow labels as 'Agent listings' only homes that

18 are listed by members of the NAR or MLS" and labels "homes listed by REX agents as 'Other

19 listings,'" *id.* ¶ 128. The Complaint therefore makes clear—repeatedly—that the specific website

20 changes made by Zillow that allegedly harmed REX were the product of Zillow's independent

21 actions.

22     ***Second***, REX's alleged injury is not redressable in a case against NAR. In its prayer for

23 relief, REX seeks two injunctions against NAR, which would prohibit it from: (1) "enforcing,

24

25     [5] REX cannot, consistent with Rule 11, amend its Complaint to allege that Zillow only belongs
26 to multiple listing services affiliated with NAR that have adopted a rule like Section 18.3.11. As
   shown during the preliminary injunction proceedings, there is no dispute that Zillow belongs to
27 NAR-affiliated multiple listing services that do not require their members to separately display
   listings data obtained from non-MLS sources. *See* ECF 64, NAR Opp. to Motion for PI, at 5; ECF
28 66, Glass Decl. in Support of NAR Opp. to Motion for PI, Ex. 2 at § 12.16.14, Ex. 3 at 1.

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    6

1   implementing, or operating under any agreement, conspiracy, combination, or membership rule

2   requiring segregation of REX's residential real estate listings from listings of NAR members and/or

3   MLS members on any website controlled by Zillow"; and (2) "enforcing, implementing, or

4   operating under any agreement, conspiracy, combination, or membership rule requiring Zillow to in

5   any way indicate that REX's residential real estate listings are not represented by a licensed agent

6   or broker on any website controlled by Zillow."  Compl. ¶ I.  But NAR does not require either of

7   these things today.  As shown by the allegations in REX's Complaint, NAR's optional model rule

8   does not require segregation of REX's residential real estate listings (or anyone else's for that

9   matter) or force Zillow to indicate that REX's residential real estate listings are not associated with

10  a licensed agent or broker.  Thus, even if REX obtained the relief it seeks against NAR, local

11  multiple listing services could still require listings data to be separately displayed by their members

12  and Zillow could still use the exact same website design and labels that it uses today.  That means

13  REX's complained-of injuries are not redressable under its claims against NAR.

14  **B.      REX Has Not Asserted a Valid Antitrust Claim Under Federal or State Law**

15          **1.      There Is No Agreement Concerning the Commingling of Listings**

16          "Whether a plaintiff pursues a per se claim or a rule of reason claim under § 1, the first

17  requirement is to allege a 'contract, combination in the form of trust or otherwise, or conspiracy.'"

18  *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 663 (9th Cir. 2009) (quoting

19  15 U.S.C. § 1).  "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of

20  trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is

21  whether the challenged anticompetitive conduct stems from independent decision or from an

22  agreement, tacit or express."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (cleaned up).

23  "Independent action is not proscribed," which means an antitrust plaintiff must allege facts that

24  plausibly suggest the defendants had "a conscious commitment to a common scheme designed to

25  achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761, 768

26  (1984).  If a plaintiff fails to allege facts that plausibly suggest such an agreement, its complaint

27  must be dismissed.  *See*, *e.g.*, *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,

28  795 F.3d 1124, 1131 (9th Cir. 2015) (affirming dismissal of a Section 1 claim that challenged

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                           7

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1    eligibility rules for new top-level domains on the internet that were adopted by a non-profit
2    controlled by "industry insiders"); *Lenhoff Enterprises, Inc. v. United Talent Agency, Inc.*, 729 F.
3    App'x 528, 530 (9th Cir. 2018) (affirming dismissal of a Section 1 claim because a "conclusory
4    allegation of parallel conduct . . . does not adequately state a § 1 claim"). Washington's state law
5    prohibition of "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in
6    restraint of trade or commerce," RCW 19.86.030, which is patterned after the Sherman Act, is
7    governed by a nearly identical standard, *see State v. LG Elecs., Inc.*, 375 P.3d 1035, 1044 n.3 (2016)
8    (McCloud, J., concurring in part).

9         REX's allegations do not plausibly establish the existence of an agreement. Section 18.3.11
10   is optional, and REX has not alleged any facts showing there is an agreement between NAR and the
11   local multiple listing services or between NAR and Zillow to "segregate" REX's listings on Zillow's
12   website. Indeed, REX has expressly alleged that NAR-affiliated multiple listing services have not
13   agreed to follow Section 18.3.11 and that Zillow's choice to use the two tabs on its website,
14   nationwide, was its own independent choice. Not only does that conclusively show there is no
15   antitrust claim here, it also distinguishes this case from *United States v. Nat'l Ass'n of Real Estate
16   Bds.*, 339 U.S. 485 (1950), a case cited in REX's preliminary injunction briefing, where the
17   defendants "agree[d] to abide by [a] code" that provided: "Brokers should maintain the standard
18   rates of commission adopted by the board and no business should be solicited at lower rates." *Id.* at
19   488. There is no such agreement here.

20        Moreover, allegations of an unlawful agreement must be supported by "evidence that is
21   capable of sustaining a rational inference of conspiracy and that tends to exclude the possibility that
22   the defendant acted independently of the alleged co-conspirators." *Wilcox v. First Interstate Bank
23   of Oregon*, 815 F.2d 522, 525 (9th Cir. 1987) (cleaned up). But REX's allegations "just as easily
24   suggest rational, legal business behavior," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th
25   Cir. 2008), by Zillow. Zillow's decision to separately display all non-multiple listing service listings
26   on its website in every market—including those where it is not required to do so under local multiple
27   listing service rules—at least plausibly suggests that Zillow acted independently, which is sufficient
28   to dispose of REX's Section 1 claim, even at the pleading stage. *See In re Musical Instruments &*

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    8

*Equip. Antitrust Litig.*, 798 F.3d 1186, 1189 (9th Cir. 2015) (affirming dismissal because allegations of "'conduct that could just as well be independent action' are insufficient to state a claim under § 1 of the Sherman Act" (quoting *Twombly*, 550 U.S. at 557)).

### 2. REX Fails to Allege Antitrust Injury

In order to establish standing to bring an antitrust action, every private plaintiff "must prove the existence of '***antitrust*** injury,'" *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (quoting *Atl. Richfield Co. v. USA Petroleum Co.* ("*ARCO*"), 495 U.S. 328, 334 (1990)), which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *ARCO*, 495 U.S. at 334). "Antitrust injury does not arise . . . until a private party is adversely affected by an ***anticompetitive*** aspect of the defendant's conduct," *ARCO*, 495 U.S. at 339, "such as reduced output, increased prices, or decreased quality in the relevant market," *Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2284 (2018). "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-***reducing*** aspect or effect of the defendant's behavior." *ARCO*, 495 U.S. at 344.

REX's entire antitrust injury theory rests on the claim that REX offers lower average total commissions than the average total commissions charged by other real estate brokers. Compl. ¶ 7. Based on this claim, REX presumes that its placement on the "Other Listings" tab of Zillow's website has harmed competition by "driving consumers away from REX and back into the MLS regime." *Id.* ¶ 8. These allegations fall well short of establishing harm to competition for at least two reasons.

***First***, as the Complaint makes clear, REX is still competing in the market and offering its services to whoever wants them. Outside of Zillow, REX advertises its listings directly to consumers, including through "personalized ads." Compl. ¶ 41. And it still advertises its listings on Zillow, on the first tab of the website, through co-listings, *id.* ¶ 111, and on the second tab of Zillow's website, *id.* ¶¶ 74, 78. Thus, from the allegations in the Complaint, it is clear that consumers have not lost access to REX's allegedly lower-priced commissions.

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    9

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

**Second**, REX has not established that its presence in the market has a meaningful impact on competition that benefits consumers.  REX has not alleged that there are no other brokers in the market, including those who are members of multiple listing services, that also offer consumers lower-than-average commissions.  REX seems to simply assume that because it purportedly charges lower-than-average commissions, no one else does.  That is not plausible.

Indeed, according to REX's own allegations, it is implausible that REX, or the visibility of REX's listings on Zillow, has any impact on competition or the prices paid by consumers for brokerage services.  REX alleges that "Americans spend an estimated $100 billion annually just on the commissions for buying and selling homes."  Compl. ¶ 36.  Yet REX purportedly has saved consumers only "$29 million" in commissions "over the past five years."  *Id.* ¶ 43.  That is less than $6 million in purported savings in a $100 billion market, which amounts to less than one-hundredth of a percent of what consumers spend annually on real estate brokerage commissions, according to REX's own allegations.  Because REX had little impact on competition in the "market as a whole" before Zillow changed its website, *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989), it stands to reason that the publication of REX's listings on a second tab of Zillow's website had no impact on competition at all.  It is implausible for REX to suggest otherwise.

The remainder of REX's allegations focus entirely on injuries sustained by REX.  For instance, even in the sections of its Complaint entitled "The Resulting Harm to Competition" and "Anticompetitive Effects," REX's allegations center on its own alleged loss of "customers and revenue."  *See* Compl. ¶ 73 ("Zillow's new web design has cost REX both customers and revenue.  Views of REX homes have plummeted on Zillow.  The sharp decline in visibility has driven down the rest of REX's business.  Fewer online viewers mean fewer interested buyers visiting REX homes.  And fewer showings resulted in a corresponding drop in sales and thus lost brokerage service revenues to REX."); *id.* ¶ 111 ("REX is experiencing dramatic declines in consumer views of its listings on Zillow sites, which has also led to decreased showing activity.  Because of decreased activity on its listings, REX clients have questioned REX's effectiveness, have questioned why they cannot find their property on Zillow, have requested that REX co-list properties with MLS members to increase its online profile, and have cancelled their listing agreements with REX.  REX

1    is also losing additional customers due to the related reputational impact of dissatisfied clients and

2    the inability of potential new clients to see REX listings and inquire about representation."). These

3    injuries do not amount to harm to competition. They are merely allegations concerning harm to

4    REX, and it is blackletter law that harm to a single competitor in the form of lost business is not

5    evidence of harm to competition because "[s]hifting . . . sales to . . . other competitors in the market

6    does not directly affect consumers and therefore does not result in antitrust injury." *Pool Water*

7    *Prods.*, 258 F.3d at 1036.

8               **3.    REX Has Not Pleaded a Plausible Group Boycott Claim**

9               REX alleges that NAR and Zillow engaged in a "group boycott" that "constitutes a per se

10   violation of Section 1." Compl. ¶¶ 109, 119. But even if REX could plausibly allege that NAR and

11   Zillow agreed to change how REX's listings are displayed on Zillow's website—which it has not—

12   that would not be enough to establish a plausible per se claim. A "mere allegation of a concerted

13   refusal to deal" is insufficient. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing*

14   *Co.*, 472 U.S. 284, 298 (1985). To state a per se claim, REX must show that the alleged "boycott

15   cuts off access to a supply, facility, or market necessary to enable [it] to compete," among other

16   factors. *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988). REX, however, has

17   not alleged it has been cut off from anything. As previously discussed, *supra* §§ II.C, III.B.2,

18   according to its own allegations, REX is still advertising properties through Zillow's website and

19   elsewhere. That means, even assuming Zillow is "essential" to real estate brokerages, REX has not

20   been "cut off" from anything that is "necessary" to compete.

21              These allegations preclude REX's "group boycott" claim as a matter of law. A party's

22   ongoing participation in the relevant market conclusively establishes that it has not been "cut off"

23   from that market. *See Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, 2017 WL

24   5973279, at *5 (C.D. Cal. Mar. 7, 2017) (dismissing complaint in part because "Plaintiffs . . . do not

25   allege that [defendants' agreement] prevents them from competing for *all* relevant work" and instead

26   "indicate[] that [they] *can* compete in the market"), *aff'd*, 780 F. App'x 467 (9th Cir. 2019). Neither

27   optional Section 18.3.11 of NAR's Model IDX Policy nor the change to Zillow's website "cuts off"

28   REX's access to the internet, the market for the provision of real estate brokerage services, or

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ               11

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1  anything else.  So REX has not plausibly alleged a group boycott that is illegal per se.  *See Hahn*,
2  868 F.2d at 1030.

3  **4.    REX Has Not Pleaded a Plausible Claim Under the Rule of Reason**

4  Assuming solely for the sake of argument that REX had alleged a plausible conspiracy
5  between NAR and Zillow, it still has failed to allege the other required elements of a rule of reason
6  case.  *See Hahn*, 868 F.2d at 1030 n.9 (stating that, for boycott cases, the analysis of whether the
7  defendants' conduct is per se illegal is substantively the same as a full rule of reason analysis).  In a
8  rule of reason analysis, "the plaintiff has the initial burden to prove that the challenged restraint has
9  a substantial anticompetitive effect that harms consumers in the relevant market."  *Amex*, 138 S. Ct.
10 at 2284.  This burden can be satisfied through direct evidence—"proof of actual detrimental effects
11 on competition, such as reduced output, increased prices, or decreased quality in the relevant
12 market."  *Id.* (cleaned up).  Or it can be satisfied through indirect evidence—"proof of market power
13 plus some evidence that the challenged restraint harms competition."  *Id.*  REX's Complaint does
14 not contain factual allegations that, taken as true, would be sufficient to meet its burden with either
15 type of evidence.

16 As discussed *supra*, § III.B.2, REX has not pleaded facts showing direct evidence that
17 publication of its listings on the second tab of Zillow's website reduced output, increased prices, or
18 decreased quality in the putative market for "real estate brokerage services."  At best, the injuries
19 alleged in its Complaint are injuries to REX, not harm to consumers.

20 REX also has failed to allege facts that would allow it to plausibly assert a claim using
21 indirect evidence.  To prove market power through indirect evidence, "a plaintiff must: (1) define
22 the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show
23 that there are significant barriers to entry and show that existing competitors lack the capacity to
24 increase their output in the short run."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th
25 Cir. 1995).  In addition to these elements, a plaintiff must also show "that the challenged restraint
26 has a substantial anticompetitive effect that harms consumers in the relevant market."  *Amex*, 138
27 S. Ct. at 2284.  REX's Complaint fails on all of these points.

28

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    12

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1   ***First***, REX's putative relevant market, the market for "real estate brokerage services,"
2   Compl. ¶ 102, is implausible because it appears to exclude consumers who provide real estate
3   brokerage services to themselves.  REX's Complaint alleges in several places that consumers
4   commonly do not need or want to use a real estate agent to purchase or sell homes.  According to
5   the Complaint, sites like Zillow allow consumers to "shop for a home without an agent," *id.* ¶ 49,
6   and REX alleges that "NAR's own research shows that fifty-two percent—more than half—of home
7   buyers found the home they bought on the internet," *id.* ¶ 53.  Indeed, according to REX's
8   allegations, "sixty-eight percent of online buyers find their home without an agent," and "REX's
9   platform allows direct-to-consumer reach and reduces customer acquisition costs." *Id.* ¶ 41.  All of
10  these allegations suggest that REX claims consumers do not need the services of an agent to buy or
11  sell a home, which means "self supply" should be included within the relevant market as alleged by
12  REX. *See AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1078-79 (C.D. Cal. 2015)
13  (rejecting putative market for third party "shipping consultation services" because "Plaintiff
14  arbitrarily exclude[d] shippers' in-house employees who similarly gather and analyze shipper data
15  to advise a shipper on methods of saving money on its carrier contracts"), *aff'd sub nom. AFMS LLC*
16  *v. United Parcel Serv., Inc.*, 696 F. App'x 293 (9th Cir. 2017).  According to its own allegations,
17  REX failed to include all reasonable substitutes within its relevant market, which renders it
18  implausible. *See Rebel Oil*, 51 F.3d at 1435 ("If consumers view the products as substitutes, the
19  products are part of the same market.").

20  ***Second***, REX has failed to allege NAR has market power in any of its putative local markets
21  for "real estate brokerage services."  In fact, REX has not alleged market shares for any of "local
22  markets throughout the country where REX operates."  Compl. ¶ 102.  REX's allegation that "NAR
23  members constitute a predominate share, more than 70 percent, of market participants (active
24  licensees) per NAR, *id.* ¶ 103, does not establish that NAR, or any of the local multiple listing
25  services affiliated with NAR, have market power in any of REX's alleged "local markets."

26      At best, REX alleges that a large percentage of real estate agents nationwide are
27  REALTORS®. *See* Compl. ¶¶ 23, 103.  That does not, however, establish that NAR or one of its
28  affiliates has market power in the specific local markets where REX operates. *See Rebel Oil*, 51

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    13

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1   F.3d at 1434 (a plaintiff must "define the relevant market," then "show that the defendant[s] own[]

2   a dominant share of that market"); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL

3   5694452, at *12 (N.D. Cal. Oct. 18, 2013) ("[T]he plaintiffs allege that Aetna 'insures

4   approximately 9% of the U.S. population.' However, they do not state Aetna's market share in any

5   of the five product and geographic markets identified in the FAC . . . ." (citation omitted)). Indeed,

6   the Complaint does not even specifically identify the putative local geographic markets where REX

7   operates, which means REX has not met its pleading burden. *See Ceiling & Interior Sys. Supply,*

8   *Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1394 (W.D. Wash. 1993), *aff'd*, 37 F.3d 1504 (9th

9   Cir. 1994) (granting summary judgment in Section 2 case based on plaintiff's failure to "identify

10  the geographic market it accuses [defendant] of attempting to monopolize").

11          **Third**, REX has advanced no allegations concerning barriers to entry at all.

12          **Fourth**, for the reasons previously explained, *supra* § III.B.2, REX fails to plausibly allege

13  that Section 18.3.11 or the change to Zillow's website have a "substantial" negative impact on

14  competition.

15          Because REX's allegations fail to satisfy any of these elements, it has failed to state a valid

16  claim under the rule of reason. *See, e.g.*, *Khalid v. Microsoft Corp.*, 2020 WL 1674123, at *5-6

17  (W.D. Wash. Apr. 6, 2020) (dismissing a Section 1 claim for failure to sufficiently plead injury to

18  competition); *Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*, 2009 WL 10727790, at *6 (W.D.

19  Wash. Nov. 16, 2009) (dismissing a Section 1 claim where "the Complaint does not contain enough

20  information about the relevant market to assess the plausibility of plaintiff's assertion that

21  competition has been harmed or restrained by the non-competition clauses at issue"); *Pennsylvania*

22  *Ave. Funds v. Borey*, 569 F. Supp. 2d 1126, 1134-35 (W.D. Wash. 2008) (dismissing a Section 1

23  claim "because Plaintiff has not alleged the existence of a relevant market" or "market power").

24  **C.    REX Has Not Asserted Valid False Advertising Claims Against NAR**

25          REX's Lanham Act and Washington Consumer Protection Act claims are based on the same

26  conduct: Zillow's decision to (1) label REX listings as "Other Listings" instead of "Agent Listings,"

27  *see* Compl. ¶¶ 19, 141; and (2) group REX listings "alongside FSBOs and foreclosures" on the

28  "Other Listings" tab, *see id.* ¶ 78. None of that alleged conduct involved NAR, as is confirmed by

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                    14

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000

1  the allegations in the Complaint.  *See supra* § III.A.

2  **D.      REX Cannot Cure Its Pleading Deficiencies Through Amendment**

3        A court need not permit leave to amend a complaint when amendment would be futile.  *See*

4  *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).  And

5  when leave to amend is granted, "the amended complaint may only allege 'other facts consistent

6  with the challenged pleading.'"  *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990)

7  (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

8        There is no way for REX to state a valid claim against NAR by alleging additional facts that

9  are consistent with its current Complaint, especially in light of the evidence that Zillow and NAR

10 submitted in opposition to REX's preliminary injunction motion.  REX cannot amend its Complaint

11 to allege Section 18.3.11 is a mandatory rule because it is—indisputably, and according to REX—

12 optional.  REX cannot amend its Complaint to plead that it can no longer participate in the market

13 for real estate brokerage services because it is—indisputably, and according to REX—participating

14 in that market.  And REX cannot amend its Complaint to allege that Section 18.3.11 required Zillow

15 to use the phrases "Agent Listings" and "Other Listings" on its website because REX quotes the

16 text of Section 18.3.11 in its current Complaint and there is no such requirement.

17       At bottom, Section 18.3.11 of NAR's IDX Policy is neither mandatory nor anticompetitive,

18 and REX cannot state a claim without outright contradicting the allegations in its current Complaint.

19 NAR therefore respectfully submits that leave to amend would not be proper here.

20                                   <u>**CONCLUSION**</u>

21       NAR respectfully requests that the Court dismiss REX's Complaint with prejudice and

22 without leave to amend.

23

24

25

26

27

28

1  DATED June 30, 2021

2                                      QUINN EMANUEL URQUHART & SULLIVAN, LLP

3
                                          */s/ Thomas C. Rubin*
4                                       Thomas C. Rubin, WSBA #33829
                                        1109 First Avenue, Suite 210
5                                       Seattle, WA 98101
                                        Phone (206) 905-7000
6                                       Fax (206) 905-7100
                                        tomrubin@quinnemanuel.com
7
                                        Ethan Glass (*pro hac vice*)
8                                       Michael D. Bonanno (*pro hac vice*)
                                        1300 I Street, Suite 900
9                                       Washington, D.C. 20005
                                        Tel: 202.538.8000
10                                      Fax: 202.538.8100
                                        ethanglass@quinnemanuel.com
11                                      mikebonanno@quinnemanuel.com

12
                                        *Attorneys for Defendant National Association of*
13                                      *REALTORS®*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2021, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to counsel of record.

DATED: June 30, 2021.

*/s/ Thomas C. Rubin*

Thomas C. Rubin, WSBA #33829

NAR'S MOTION TO DISMISS
Case No. 2:21-cv-00312-TSZ                17

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
(206) 905-7000